IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JACK WITHERS,<br><br>    Plaintiff,<br><br>v.<br><br>CHARLES FRATES,<br><br>    Defendant. | 3:16-cv-01730-BR<br><br>OPINION AND ORDER |

**KEVIN T. LAFKY**
**DAEMIE M. KIM**
Lafky & Lafky
429 Court Street, NE
Salem, OR 97301
503-585-2450

    Attorneys for Plaintiff

**ELLEN F. ROSENBLUM**
Attorney General
**ROBERT E. SULLIVAN**
Senior Assistant Attorney General
**ANDREW D. HALLMAN**
Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700

    Attorneys for Defendant

**BROWN, Judge.**

    These matters come before the Court on the Motion (#38) for

1 – OPINION AND ORDER

Summary Judgment and Motion (#57) to Strike Portions of the Declaration of Jeremy Bauer filed by Defendant Charles Frates, and the Motion (#54) to Strike Testimony Offered in Support of Defendant's Motion for Summary Judgment filed by Plaintiff Jack Withers.

For the reasons that follow, the Court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES as moot** Defendant's Motion to Strike and Plaintiff's Motion to Strike.

## **BACKGROUND**

The following facts are taken from the Joint Statement of Agreed Facts (#41) and the materials the parties submitted in support of their Motions. Accordingly, these facts are undisputed unless otherwise noted.

Jayson Withers was an inmate at Eastern Oregon Correctional Institution (EOCI) in Pendleton, Oregon, from 2010 until August 29, 2014, when he died after Defendant Frates, a corrections officer at EOCI, shot him.

EOCI houses approximately 1,600 male inmates. The EOCI facility is divided into East and West sides, and each side has a recreation yard referred to as the "East Yard" and "West Yard" respectively.

Whenever inmates are in either of the yards, there are corrections officers on the ground among the inmates who do not carry firearms but do carry pepper spray. These officers also carry radios that are set to a designated channel for their EOCI

area.

There is one guard tower for the West Yard where this incident occurred. A corrections officer is assigned to the tower whenever inmates are in the West Yard. The tower officer supervises the yard from inside a small booth on the tower or from an adjacent platform. The tower officer carries a radio and is armed with a Ruger Mini-14, which is a .223 caliber semi-automatic rifle with a four-power scope. The tower officer also has access to a footpedal-operated public-address system to communicate with inmates in the yard.

Each yard is equipped with several video cameras, but those cameras do not canvas the entire yard. The cameras are remotely controlled by the EOCI Control Center. If an officer reports by radio that an incident is occurring, the Control Center can then pan, zoom, and record the incident at the appropriate location.

On the morning of August 29, 2014, Defendant was assigned duty in the West Yard Tower, and, accordingly, he went to the EOCI Armory, logged in, obtained the firearms required for his assigned tower duties, and proceeded to the West Yard Tower.

Before inmates were released into the West Yard for recreation that morning, Defendant was at his assigned station in the West Yard Tower and Corrections Officers Steven Surber, Chester Kropornicki, and Dennis Bliss were on the ground in the West Yard. After these four officers were in their assigned places, inmates were allowed to enter the West Yard, which opened at approximately 8:30 a.m. Approximately 189 inmates entered the

yard, including Withers, Cameron Hayes, and Eric Sexton.

Shortly after entering the yard Withers and Hayes had their photo taken with a few other inmates, and Defendant saw some of that activity from his position in the tower. After their photos were taken, Withers and Hayes approached Sexton and requested Sexton to take a walk with them around the West Yard track.

At some point Withers and Hayes engaged in an altercation with Sexton near the backstop at the far end of the West Yard, but Defendant did not observe Withers, Hayes, or Sexton after the time Withers and Hayes had their photos taken until the altercation was already underway.

When Defendant saw the altercation from inside the tower, he stepped out of the tower with his rifle, used the rifle scope to observe the altercation, lowered his rifle, and then chambered a round. Defendant also heard someone call out "stop fighting."

In the meantime, Officers Surber, Bliss, and Kropornicki also saw the altercation, and all three officers proceeded toward the three inmates. In particular, Officer Surber ran toward the three inmates and yelled at them to stop.

After chambering a round, Defendant aimed the rifle at Withers's center of mass, fired a shot, and struck Withers.

Defendant did not fire a warning shot, blow a whistle, or use the foot-pedal operated public-address system before shooting Withers. At the time Defendant fired the shot (approximately 8:45 a.m.) the altercation had being going on for less than a minute. Before Defendant fired the shot one of the

yard cameras was panned to the location of the altercation, but the placement of the camera put it directly into the sun, and the video taken immediately before the shot was unusable.

The shot Defendant fired entered through Withers's neck at the approximate level of bifurcation of the carotid; transected his jugular vein on the left; struck his larynx, epiglottis, vocal chords, and strap muscles; exited his neck and immediately reentered his clavicle; and finally exited under his right arm. Withers died on the way to the hospital due to excessive blood loss.

Sexton was able to walk off the yard under his own power, and at 9:50 a.m. Sexton was transported to St. Anthony's Hospital in Pendleton, Oregon. He was diagnosed with a left orbital fracture, facial swelling, and a headache. Sexton did not show any signs of intracranial or spinal trauma after further testing. Sexton was discharged at 12:40 p.m. and did not require further hospitalization for his injuries. All follow-up treatment occurred in Oregon Department of Corrections (ODOC) facilities.

Tower officers are authorized to use lethal force consistent with ODOC's rules and are required to comply with the following provisions:

> Oregon Administrative Rule (OAR) 291-013-0185(7) (general provisions): "The use of force must be objectively reasonable under all the circumstances known to the employees at the time. The use of force may range from verbal commands to the use of lethal force. If the force other than lethal force reasonably appears to be sufficient to achieve the correctional objective, lethal force shall not be used."
>
> OAR 291-013-0215(2)(lethal force): "Lethal force may

> be used [in a Medium Facility] when and to the extent that an employee reasonably believes it necessary: (a) To prevent imminent serious bodily injury or death to one's self or another person; . . . (c) To prevent or stop a riot or other group disturbance by inmates where there is reason to believe an inmate poses a threat of escape or imminent serious bodily injury or death to another person."
>
> OAR 291–013–0215(1)(lethal force): "Employees shall consider every reasonable means of control before resorting to the use of lethal force."
>
> OAR 291–013–0215(4)(lethal force): "Prior to resorting to the use of lethal force against an inmate or other person, if feasible, the employee shall give a verbal warning from the imminent use of lethal force."
>
> OAR 291–013–0215(7)(lethal force): "Firearms will not be used if innocent people are in the line of fire."

Defendant was trained in and familiar with these rules, he maintained his annual firearms proficiency in accordance with ODOC rules, and he was qualified on the Ruger .223 rifle with and without a scope. After the incident, ODOC reviewed Defendant's conduct and determined the force used was in compliance with ODOC's use-of-force policy. A state-court Grand Jury also determined Defendant's use of force was justified.

The parties agree Defendant was acting under color of law and within the course and scope of his employment at all times relevant to this incident.

## **STANDARDS**

### I. **Summary Judgment**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id*. "This burden is not a light one . . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted). A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary

judgment." *Deering v. Lassen Cmty. Coll. Dist.*, No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)). When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id*.

**II. Section 1983**

Section 1983 provides a remedy for the violation of constitutional rights by any person acting under color of state law. 42 U.S.C. § 1983. Nevertheless, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)(internal quotation marks omitted).

Qualified immunity is an immunity from being required to defend a § 1983 action. *Morales v. Fry,* 873 F.3d 817, 822 (9th Cir. 2017)(citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The court follows a two-step test to evaluate whether qualified immunity precludes such an action "under which summary judgment is improper if, resolving all dispute of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was 'clearly established' at the time of the violation." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016)(*en banc*). *See also Demaree v. Pederson*, No. 14-16207, 2018 WL 505254, at *6 (9th Cir., Jan. 22, 2018).

**DISCUSSION**

Plaintiff brings a claim against Defendant pursuant to 42 U.S.C. § 1983 for Defendant's alleged violation of his Fourteenth Amendment rights.

I. **Defendant's Motion for Summary Judgment**

Defendant contends the Court should grant his summary-judgment motion on the ground that he is entitled to qualified immunity from the § 1983 claims.

Plaintiff, however, contends Defendant is not entitled to qualified immunity and that there are genuine disputes of material fact that preclude summary judgment.

A. **Standards**

1. **Qualified Immunity**

Qualified immunity shields officials from civil liability when their conduct "does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Although the law "do[es] not require a case directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017). In other words, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

To resolve questions of qualified immunity "courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right." *Id.* "The second prong of the qualified immunity analysis asks whether the right in question was clearly established at the time of the violation." *Id.* at 1866. Courts have the discretion to determine the order in which to address these two prongs. *Pearson v. Callahan*, 555 U.S. 233, 236 (2009).

Governmental actors are "shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tolan,* 134 S. Ct. at 1866. "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.*

As noted, qualified immunity protects a defendant from

a lawsuit rather than providing a mere defense to liability. *Morales,* 873 F.3d at 822.

### 2. **Fourteenth Amendment Claim**

Parents may assert a Fourteenth Amendment substantive due-process claim if they are deprived of their liberty interest in the companionship and society of their child through official misconduct. *Lemire v. California Dep't of Corrections and Rehabilitation*, 726 F.3d 1062, 1075 (9th Cir. 2013). *See also Zion v. Cty. of Orange*, 874 F.3d 1072, 1076-77 (9th Cir. 2017). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir 2008)(quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Official conduct shocks the conscience if it occurs with "deliberate indifference" or with a "purpose to harm . . . unrelated to legitimate law-enforcement objectives." *Porter,* 546 F.3d at 1137. *See also Zion,* 874 F.3d at 1077 (citing *Porter,* 546 F.3d at 1133). The standard of deliberate indifference is applicable "only when actual deliberation is practical." *Zion*, 874 F.3d at 1077. *See also Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *Cty. of Sacramento v. Lewis*, 523 U.S. 883, 1719 (1998). "[I]n circumstances where an officer cannot practically deliberate, such as where 'a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement

objectives.'" *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013)(citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

The "purpose to harm" standard of culpability requires proof of "the intent to inflict force beyond that which is required by a legitimate law enforcement objective." *Porter*, 726 F.3d at 1140.

Thus, an officer is entitled to qualified immunity in the context of a Fourteenth Amendment claim when either (1) the plaintiff has not alleged or shown facts that would constitute a constitutional violation or (2) the plaintiff has shown such a violation was not clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

**B.  Analysis**

As noted, Defendant contends the Court should grant his summary-judgment motion on the ground that he is entitled to qualified immunity on Plaintiff's Fourteenth Amendment claim for violation of Plaintiff's substantive due-process rights. Defendant argues it is not a clearly-established law that the "purpose-to-harm" standard applies to a substantive due-process claim in a prison-shooting case. Even if that standard is clearly established, a genuine dispute of material fact does not exist as to whether Defendant acted with a purpose to harm.

Plaintiff, however, contends Defendant is not entitled to qualified immunity and that there are genuine disputes of

material fact that preclude summary judgment.  Plaintiff argues Defendant's conduct in killing Withers was "malicious" and "shocks the conscience."  According to Plaintiff, therefore, Defendant's conduct violated Plaintiff's Fourteenth Amendment due-process rights as a parent.

In *Marquez v. Gutierrez*, 322 F.3d 689 (9th Cir. 2003), the plaintiff was a bystander during an assault on another inmate when he was seriously injured after being shot by a corrections officer stationed in a guard tower located some 360 feet from the disturbance.  The plaintiff contended the defendant could not have reasonably believed his decision to shoot the plaintiff was lawful when there was a dispute as to the plaintiff's involvement in the incident.  The defendant, however, asserted he relied on the prison's use-of-force policy, which allowed use of force if bodily injury was occurring.  Thus, the defendant contended the disputed facts about who was actually kicking the other inmate was immaterial.  The Ninth Circuit noted even if there was a constitutional violation of the plaintiff's rights, the defendant would still be entitled to qualified immunity "if a reasonable officer could have believed his conduct was lawful."  322 F.3d at 692.  The court emphasized qualified immunity is a separate inquiry from whether prison officials acted unconstitutionally, and a claim of qualified immunity is not defeated merely because there is a triable issue of fact as to whether the defendant's decision to shoot the plaintiff was malicious.  Thus, the court found the officer could be entitled to qualified immunity even if

13 - OPINION AND ORDER

he was mistaken in his perception of what was happening.

> A reasonable officer standing where [the defendant] was standing . . . could perceive that both [the plaintiff] and another inmate were kicking [the victim] and threatening [the victim] with serious injury or death, and that [the victim] was not capable of protecting himself, even if no kick was actually administered by [the plaintiff]. The scenario may look different when gauged against the "20/20 vision of hindsight," but we must look at the situation as a reasonable officer in [the defendant's] position could have perceived it. [citations omitted.] In that light, we believe that a reasonable officer could believe that shooting one inmate in the leg to stop an assault that could have seriously injured or killed another inmate was a good faith effort to restore order, and thus lawful.

322 F.3d at 693.

In *Jeffers v. Gomez* the Ninth Circuit also stated:

> Where a prison security measure is undertaken ostensibly for the protection of prison officials and the inmate population, force is deemed legitimate as long as it applied in a good faith effort to maintain or restore discipline and not maliciously and sadistically for the very purpose of causing harm.

267 F.3d 895, 910 (9th Cir. 2001)(citing *Whitley v. Albers*, 475 U.S. at 321).

It is clearly established that a police officer who acts under circumstances in which "actual deliberation is [not] practical" violates an individual's Fourteenth Amendment due-process rights if the officer acts with a "purpose to cause harm unrelated to the legitimate object" of law-enforcement objectives even if he acts in the defense of others. *A.D.*, 712 F.3d at 454. *See also Moreland v. Las Vegas Metropolitan Police Dep't,* 159 F.3d 365, 372 (9th Cir. 1998).

In *Cty. of Sacramento v. Lewis* the Court concluded a high-speed chase by police that ended in the death of a motorcyclist did not meet the shocks-the-conscience test because the police did not have the intent to harm the motorcyclist. The Court noted a higher standard of fault is required for officer liability when the officer must make a decision "in haste, under pressure, and frequently without the luxury of a second chance" such as during prison riots. The Court stated:

> In those circumstances, liability should turn on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." (quoting *Whitley v. Albers*, 475 U.S. at 320-21).

523 U.S. at 853.

Defendant testified he observed from his seated position in the tower what appeared to be two inmates kicking the chain-link fence in the yard. When he stood up, he could see the two inmates standing shoulder-to-shoulder and kicking another inmate who was on the ground. Defendant stepped out of the tower with his rifle and observed the altercation through his scope. With the aid of the scope he could see the victim against the fence on the ground being repeatedly kicked or stomped by the other two inmates. The victim appeared to be unconscious and was not defending himself. Defendant described the attack as "the most violent, vicious attack [he] had ever witnessed."

It is undisputed that other staff shouted "stop fighting," but Withers and Hays continued their assault on Sexton. It is also undisputed that the altercation was ongoing

15 – OPINION AND ORDER

at the time Defendant shot Withers. All three yard officers who witnessed the fight testified the force used by Defendant was justified.

It is also undisputed that Withers and another inmate were assaulting Sexton (who was on the ground and was being kicked and/or stomped repeatedly) and that Sexton did not appear to be defending himself. Viewing the evidence in the light most favorable to Plaintiff, the Court notes none of the factual disputes asserted by Plaintiff establish Defendant acted "for the very purpose of causing harm" to Withers. In fact, the Court concludes on this record that a reasonable officer in Defendant's position could believe that shooting someone who appeared to be causing serious bodily injury to a person who was on the ground and appeared to be unconscious was a good-faith effort to maintain and/or to restore discipline.

The Court also notes that ODOC policy allows the use of lethal force to prevent imminent serious bodily injury or death and/or to prevent or to stop a riot or other group disturbance by inmates when there is reason to believe an inmate poses a threat of imminent serious bodily injury or death to another person. Defendant was familiar with these regulations. Moreover, ODOC reviewed Defendant's conduct and determined the force used was in compliance with ODOC's use-of-force policy, and a state-court Grand Jury also determined Defendant's use of force was justified.

Here, even viewing the evidence in the light most

favorable to Plaintiff, none of the factual disputes asserted by Plaintiff establish Defendant acted maliciously or sadistically "for the very purpose of causing harm" to Withers.

On this record the Court concludes there are not any plausible facts that establish Defendant acted with any purpose other than to stop the assault on the victim. The Court also concludes the force applied by Defendant was a good-faith effort to restore discipline.

Accordingly, the Court concludes as a matter of law that Defendant did not violate Plaintiff's Fourteenth Amendment rights and is entitled to qualified immunity.

## II. Motions to Strike

Plaintiff moves to strike the testimony of Eugene Atherton and Rod Englert submitted by Defendant in support of Defendant's Motion for Summary Judgment.

Defendant, in turn, moves to strike portions of the testimony by Jeremy Bauer submitted by Plaintiff in opposition to Defendant's Motion for Summary Judgment. Each side contends the evidence submitted by the other is inadmissible under the standards set out in *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Because the Court has not considered these Declarations in reaching its determination of the issues presented in Defendant's Motion for Summary Judgment, the Court denies as moot each parties' respective Motions to Strike these Declarations.

**CONCLUSION**

For these reasons the Court **GRANTS** Defendant's Motion (#38) for Summary Judgment and **DISMISSES** this case **with prejudice.** The Court **DENIES as moot** Defendant's Motion (#57) to Strike and Plaintiff's Motion (#54) to Strike.

IT IS SO ORDERED.

DATED this 2nd day of February, 2018.

/s/ Anna J. Brown

ANNA J. BROWN
United States Senior District Judge